# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TERI LYNN MELLIAN,

     Plaintiff,

                                        Case No. 14-10867

v.                                 Hon. Gerald E. Rosen

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

     Defendant.

_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS TO AFFIRM OR REVERSE
## THE DECISION OF THE PLAN ADMINISTRATOR

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____February 12, 2016_____

PRESENT:     Honorable Gerald E. Rosen
                   United States District Judge

## I.  INTRODUCTION

In the present suit, Plaintiff Teri Lynn Mellian challenges the decision by

Defendant Hartford Life and Accident Insurance Company to deny her claim for

continued benefits under a group long term disability policy (the "Policy") issued

by Defendant to Plaintiff's employer, Atkore International.  This Court's subject

matter jurisdiction over this case rests upon Plaintiff's claim for benefits under an

employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Presently before the Court are Plaintiff's and Defendant's cross-motions to reverse or affirm, respectively, the Defendant insurer's determination that as of March 1, 2013, Plaintiff was no longer eligible for long term disability benefits under the Policy.  In support of her motion to reverse this decision, Plaintiff argues (i) that the Court should review the Defendant insurer's decision *de novo,* and (ii) that, regardless of the governing standard of review, Defendant's decision impermissibly rests on a file review by non-examining medical consultants who unduly discounted or, in some instances, wholly failed to consider the opinions and findings of Plaintiff's treating physicians.  For its part, Defendant contends (i) that the more deferential "arbitrary and capricious" standard governs this Court's review, and (ii) that its denial of Plaintiff's claim for long term disability benefits is properly supported by the findings of two board-certified independent medical consultants that as of March 1, 2013, Plaintiff was capable of performing the essential duties of her position as an accounting specialist.

The parties' cross-motions have been fully briefed and are ready for decision.  Upon reviewing the parties' submissions, the pleadings, and the administrative record, the Court finds that the relevant allegations, facts, and legal

2

arguments are adequately presented in these materials, and that oral argument would not significantly aid the decisional process. Accordingly, the Court will decide the parties' motions "on the briefs," *see* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan, in accordance with the guidelines articulated by the Sixth Circuit in *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 619 (6th Cir. 1998).[1] This opinion and order sets forth the Court's findings of fact and conclusions of law. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

## II. <u>FINDINGS OF FACT</u>

### A.    The Parties

Plaintiff Teri Lynn Mellian began her employment with Atkore International in November of 2000, working in the company's Unistrut International Division in Wayne, Michigan. As an Atkore employee, Plaintiff was eligible for short and long term disability benefits. The particular long term disability policy that governs here (the "Policy") was issued to Atkore in June of 2011 by Defendant

---

[1]Specifically, *Wilkins* holds that neither a summary judgment ruling nor a bench trial is an appropriate procedural mechanism for resolving an ERISA claim to recover benefits. Rather, the Sixth Circuit stated that district courts generally should review challenged benefit denials "based solely upon the administrative record, and [should] render findings of fact and conclusions of law accordingly." *Wilkins,* 150 F.3d at 619.

Hartford Life and Accident Insurance Company.  (*See* Administrative Record ("AR") at 5.)

## B.    The Relevant Terms of the Policy

This case arises from Plaintiff's request for long term disability benefits under the Policy.  In order to be considered "disabled" under the Policy, a claimant must be "prevented from performing one or more of the Essential Duties of" her own occupation during a 180-day "Elimination Period" and for the first 24 months following this elimination period, and must have current monthly earnings that are less than 60 percent of her pre-disability earnings.  (*Id.* at 7, 19.)[2]  The claimant's own "Occupation" is defined in the Policy as the occupation "as it is recognized in the general workplace," and not the "specific job" that the claimant has performed "for a specific employer or at a specific location."  (*Id.* at 22.)  In addition, an "Essential Duty" of a job is defined as a duty that is a "substantial, not incidental" part of the job, is "fundamental or inherent to the occupation," and "cannot be reasonably omitted or changed."  (*Id.* at 20.)

The Policy confers upon the Defendant insurer the "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms

---

[2]Beyond this elimination period and the initial 24 months thereafter, a claimant is deemed "disabled" under the Policy only if she cannot perform one or more of the "Essential Duties" of "Any Occupation."  (*Id.* at 19.)

and provisions of the Policy." (*Id.* at 31.)  In addition, the Policy grants Defendant the power to determine whether the proof submitted in support of a claim for benefits is "satisfactory" to establish the claimant's disability.  (*Id.* at 16.)

## C.    Plaintiff's Relevant Medical History

On November 1, 2010, Plaintiff underwent back fusion surgery to address the effects of a motor vehicle accident that occurred in 2007.  The surgery was performed by Dr. Brady T. Vibert, an orthopedic specialist.  Plaintiff was off work and drew short term disability benefits from November of 2010 until early February of 2011.  Upon her return to work, Plaintiff was placed in an accounting position that entailed a significant amount of sitting and computer use, along with document filing and retrieval, making copies of and scanning documents, and putting together binders.  (*See id.* at 90.)

When the lengthy sitting involved in her accounting position aggravated her back pain, Plaintiff work station was changed to a standing desk.  (*See id.* at 89.) This adjustment, in turn, led to pain in Plaintiff's feet.  On June 7, 2012, an orthopedic surgeon, Dr. Allan M. Grant, performed surgery on Plaintiff's right foot to remove a "significant" bunion and correct a bone/toe condition, and screws were placed in Plaintiff's foot in the course of this procedure.  (*Id.* at 309-10.)  Plaintiff was approved for short term disability benefits from the date of this surgery until

5

December 5, 2012.

In the course of several follow-up visits to Dr. Grant's office, X-rays indicated that Plaintiff's foot was healing well after her surgery, but she complained of continued pain and swelling at the surgical site. (*See id.* at 166-71.) At an October 31, 2012 office visit, Dr. Grant noted that Plaintiff's "bunion pain is gone," but opined that Plaintiff's continued pain in her foot was likely due to a reaction to the hardware inserted into her foot during surgery, and he recommended that this hardware be removed. (*Id.* at 166.) Following this procedure, an X-ray showed successful removal of the hardware and "minimal swelling" in Plaintiff's right foot. (*Id.* at 165.) At an office visit on December 12, 2012, Plaintiff was instructed to "weight-bear as tolerated" with her right foot and to "return as needed," (*id.*), and she was given a note stating that she could return to work on January 14, 2013 with the restriction that she be permitted to sit or stand "[a]s [t]olerated," (*id.* at 282).

During this same time period, Plaintiff also was seen by the physician who performed her 2010 back surgery, Dr. Vibert. At a November 20, 2012 office visit, Plaintiff reported lower back pain and "left lower extremity numbness[,] aching and burning," and she stated that these symptoms were "improved with lying down and worse with sitting, standing, walking and lifting." (*Id.* at 312.) Dr. Vibert

6

found on examination that Plaintiff had 5/5 strength in her bilateral lower

extremities and "no decreased sensation or reflexes," but that she had "decreased

lumbar range of motion secondary to pain." (*Id.*) Dr. Vibert advised Plaintiff to

"[c]ontinue with activities as tolerated" with "[n]o restrictions," and he

recommended a bone scan for "possible pseudoarthrosis." (*Id.*) If this study did

not "show any obvious pseudoarthrosis of the lumbar spine," Dr. Vibert anticipated

that he would "recommend aggressive physical therapy" to address any

"deconditioning of [Plaintiff's] lumbar muscles." (*Id.*)

On December 20, 2012, Dr. Vibert reviewed the results of the bone scan and

found that it revealed "arthritis in the lumbar spine[,] particularly L3-L5," but "not

obvious pseudoarthrosis at L4-L5." (*Id.* at 232.) An examination disclosed "pain

with range of motion of the lumbar spine," but intact "[s]ensation and motor

function . . . throughout the bilateral lower extremities." (*Id.*) Dr. Vibert opined

that Plaintiff suffered from "[l]ikely persistent lumbar radiculopathy" following her

surgery, and that "although she is better compared to before surgery she still has

some persistent pain." (*Id.*) He further stated that Plaintiff likely had achieved the

maximum possible improvement after her surgery and "should be on permanent

restrictions of no lifting more than 5-10 lbs at most, no repetitive bending, lifting,

stooping, squatting or twisting, [and no] sitting or standing for more than 30

minutes at a time." (*Id.*)  In addition, he sent Plaintiff for an MRI to "make sure she does not have any recurrent stenosis." (*Id.*)

Dr. Vibert reviewed the results of this MRI during a January 17, 2013 office visit.  Plaintiff reported at this visit that she "continue[d] to have quite a bit of pain in her back and legs[,] especially if she sits for any length of time," and that "[w]hen she stands she gets a lot of pain in her bilateral feet." (*Id.* at 229.)  On examination, Dr. Vibert found that Plaintiff's "sensation and motor function [we]re intact," and his review of the MRI disclosed "no recurrent stenosis" and "essentially no significant findings." (*Id.*)  In a "lengthy discussion" with Plaintiff, Dr. Vibert stated his belief that Plaintiff had "further neuropathy" and suggested "maybe trying Lyrica and Neurontin" for her pain, but Plaintiff responded that she was "somewhat skeptical to take these [medications] due to the side effects." (*Id.*)  Dr. Vibert concluded that Plaintiff should be placed "on permanent restrictions" with "no lifting more than 5 lbs, no repetitive bending, lifting, stooping, squatting or twisting," and no "sitting or standing for more than 30 minutes at a time," and he requested that she return "in three months' time for recheck." (*Id.*)

## D.    Plaintiff's Claim for Long Term Disability Benefits

With her short term disability benefits set to expire in early December of 2012, Plaintiff applied for long term disability benefits under the Policy issued by

8

the Defendant insurer to her employer.  This application was supported in part by an attending physician's statement ("APS") completed by Dr. Grant on November 21, 2012, which disclosed a diagnosis of bilateral bunions and indicated that this condition had improved since Plaintiff's surgery in June.  (*See id.* at 294.)  Dr. Grant opined that Plaintiff was totally disabled as of the date of his statement, but noted that Plaintiff was scheduled to have the hardware removed from her foot later in November and that she was expected to be able to return to work after the first of the year pending her  recovery from this procedure.  (*See id.* at 295.)[3] Plaintiff also submitted a November 29, 2012 APS from Dr. Vibert, indicating that Plaintiff suffered from lumbar stenosis and recommending that she limit her sitting and standing due to her reports of lower back pain and difficulty sitting or standing for any length of time.  (*See id.* at 277-78.)

In connection with Plaintiff's application for long term disability benefits, Plaintiff's employer was asked to complete a "physical demands analysis" form for the accounting specialist position that Plaintiff last held prior to her foot surgery. (*See id.* at 262-63.)  According to this analysis, the position entailed sitting for up

---

[3]As noted earlier, in a December 12, 2012 work note issued after the hardware was removed from Plaintiff's foot, a physician's assistant in Dr. Grant's office, Frank Nysowy, stated that Plaintiff was able to return to work on January 14, 2013 with the limitation that she be permitted to sit or stand as tolerated.  (*See id.* at 282.)

to half an hour at a time for a total of six hours per day, standing for no more than half an hour per day, no walking, and alternating between sitting and standing as needed.  (*See id.* at 262.)  This analysis further indicated that the position did not involve any stooping, kneeling, crouching, crawling, climbing, reaching, or lifting.  (*See id.* at 263.)  Finally, Plaintiff's employer stated that the work station for the position included an ergonomic chair, an adjustable foot rest, and an adjustable computer monitor.  (*See id.* at 262.)

In addition to this physical demands analysis provided by Plaintiff's employer, the Defendant insurer conducted an occupational analysis based on a description of the essential duties of Plaintiff's position as identified by her employer, as well as a statement of the requirements of the "accounting clerk" position as set forth in the Dictionary of Occupational Titles.  (*See id.* at 70.)  Upon performing this analysis, Defendant characterized Plaintiff's position as "[s]edentary with frequent reaching, handling, [and] fingering," and it concluded that the position entailed sitting for half an hour at a time and for six hours total per day.  (*Id.*)

In the course of processing Plaintiff's claim for long term disability benefits, Defendant followed up with Plaintiff's foot surgeon, Dr. Grant, regarding the statement in a December 12, 2012 work note from his office indicating that

Plaintiff would be able to return to work on January 14, 2013. (*See id.* at 223-24.)

Dr. Grant responded to this inquiry on February 25, 2013, opining that Plaintiff

was capable of performing "[f]ull-time, primarily sedentary activities" so long as

she was "given the opportunity to alternate" between sitting and standing positions,

to "walk as needed for comfort," and to only "occasional[ly] lift up to 10 lbs."

(*Id.*)

On March 12, 2013, Defendant advised Plaintiff that her claim for long term

disability benefits was approved, but only for the period from December 6, 2012

until February 28, 2013. (*See id.* at 106-10.) In support of this decision,

Defendant explained that the limitations and restrictions identified by Plaintiff's

physicians, Drs. Grant and Vibert, were consistent with the essential duties of

Plaintiff's position as an accounting specialist, as this position was sedentary in

nature and afforded the opportunity to alternate between sitting and standing and to

walk as needed for comfort. (*See id.* at 109.) Accordingly, Defendant concluded

that Plaintiff was no longer disabled within the meaning of the Policy as of March

1, 2013. (*See id.*)

Plaintiff took an administrative appeal from this decision on June 25, 2013.

(*See id.* at 209-11.) In support of this appeal, Plaintiff submitted additional

materials from the offices of her two treating physicians, Drs. Grant and Vibert.

11

First, Plaintiff provided progress notes from an April 9, 2013 office visit to Dr. Vibert, reporting that Plaintiff continued to experience "quite a bit" of lower back pain and "severe buttock pain, gluteal pain and pain down into her feet as well." (*Id.* at 213.)  More generally, Dr. Vibert reported that Plaintiff was "absolutely miserable," as she could not "sit for any length of time" and also could not "stand for any length of time because she develops foot pain."  (*Id.*)  Upon examining Plaintiff, Dr. Vibert found that she was physically "[s]table" and "neurologically intact," and he observed that Plaintiff had "no more compressive lesions in her back that would necessitate surgery or suggest that surgery would help her."  (*Id.*)  Dr. Vibert diagnosed Plaintiff as suffering from "permanent nerve injury" as disclosed in an electromyogram ("EMG"), as well as "chronic nerve pain," "persistent back and leg pain" following her back surgery, and "bilateral intrinsic foot abnormalities."  (*Id.*)  He reiterated the permanent restrictions imposed at a prior visit — *i.e.,* no lifting of more than five pounds, no "sitting or standing for more than 30 minutes at a time," and "no repetitive bending, lifting, stooping, squatting or twisting" — and further opined that Plaintiff "required frequent periods of lying down for back, buttock, [and] leg pain flareup."  (*Id.*)  In light of these restrictions "combined with [Plaintiff's] bilateral foot issues," Dr. Vibert concluded that Plaintiff "should be permanently disabled from her job."  (*Id.*)

12

Plaintiff's other treating physician, Dr. Grant, provided an update of

Plaintiff's condition in a March 27, 2013 letter:

> This is a patient who is under my care for problems with her feet. She
> had corrective surgery on one foot to correct a significantly
> symptomatic bunion. She has a bunion also on the opposite foot. She
> also has [a] significant lumbar problem which required surgery.
> Because of her back problems she apparently is unable to sit for more
> than 30 minutes at a time [and] because of a combination of back and
> foot problems she is not able to stand for much more than 30 minutes
> at a time. Alternating sitting and standing is not an option for her as
> both of these cause her similar discomfort. It is my medical opinion
> that this patient is unable to perform duties of her job because of the
> inability to stand or sit for more than a very short period of time. It is
> my opinion that she is medically disabled from her type of
> employment. Also, most jobs require either sitting or standing [so]
> she is not likely to be able to perform any other type of gainful
> employment because of this problem. Surgical intervention to correct
> her opposite bunion will not significantly improve her ability to stand
> or walk.

(*Id.* at 212.) Dr. Grant's office also issued a "clarification" concerning the

December 12, 2012 work note that had identified a January 14, 2013 return-to-

work date, explaining that this work note "was based on the immediate surgery of

hardware removal at that time" and did not "tak[e] into consideration the

patient[']s other medical conditions." (*Id.* at 215.)

Upon receiving this additional information in support of Plaintiff's

administrative appeal, Defendant referred Plaintiff's claim for review by a medical

consulting firm, MCMC, and this firm, in turn, designated two physicians to

13

examine the medical records of Plaintiff's foot and back conditions.  Dr. David Rubinfeld, who is board certified in orthopedic surgery, stated in an August 19, 2013 report that "[t]he available documentation does not support any restrictions or limitations related specifically to [Plaintiff's] right foot surgery," and he concluded that Plaintiff "has the ability to perform primarily sedentary work activities."  (*Id.* at 145.)  In support of these findings, Dr. Rubinfeld stated that he had discussed Plaintiff's condition with Dr. Grant, who "agreed that the feet are not the cause of this claimant's 'disability,'" and he further explained that "[t]he medical documentation related specifically to [Plaintiff's] right foot is quite limited" and that "[a] physical examination of the foot is not documented pre[-] or post-operatively."  (*Id.* at 144.)  Finally, Dr. Rubinfeld opined that "a return to work in 42 days is the best practice" for a patient, like Plaintiff, who had undergone bunion surgery on her foot.  (*Id.* at 145.)[4]

The medical records of Plaintiff's back condition, in turn, were reviewed by

---

[4]In an August 22, 2013 addendum to his initial report, Dr. Rubinfeld specifically addressed Dr. Grant's March 27, 2013 note in which he opined that Plaintiff was disabled.  In particular, while Dr. Grant stated in this March 27 note that Plaintiff was unable to sit or stand for more than 30 minutes at a time, Dr. Rubinfeld pointed to the absence of any record of a "foot exam that reflects a problem with sitting."  (*Id.* at 147.)  Dr. Rubinfeld acknowledged that Plaintiff suffered from a back problem that could affect her ability to sit, but he observed that this condition was being "addressed by a co-reviewer."  (*Id.*)  Accordingly, he concluded that the additional information provided by Dr. Grant "does not change my prior opinion" that Plaintiff was capable of sedentary work.  (*Id.*)

Dr. Steven Lobel, who is board certified in physical medicine and rehabilitation.

Dr. Lobel, like Dr. Rubinfeld, opined that Plaintiff "has the ability to perform

primarily sedentary level work activities," explaining that the medical record

disclosed only "uncomplicated spine and foot surgery," that the "examinations by

the providers [we]re normal" and the imaging of Plaintiff's spine likewise was

"normal," and that "there [wa]s no care provided other than follow-up visits,"

including "no therapy, medications, or referrals."  (*Id.* at 156-57.)  In Dr. Lobel's

view, the medical record lacked "evidence to demonstrate any physical or

functional deficits" that would support the physical restrictions and limitations

imposed by Plaintiff's physicians, leaving only "self reported pain complaints" that

were insufficient, standing alone, to preclude sedentary work.  (*Id.* at 157.)[5]

On August 28, 2013, Defendant notified Plaintiff that it was upholding its

initial decision to deny long term disability benefits after February 28, 2013.  (*See*

*id.* at 93-96.)  After summarizing the arguments made by Plaintiff in support of her

administrative appeal, the supplemental materials accompanying this appeal, and

the findings of the two MCMC physicians who reviewed Plaintiff's medical

-----

[5]Dr. Lobel stated in his report that he repeatedly attempted to contact Dr. Vibert, calling his office on three separate occasions and then faxing him a set of questions as requested by someone in his office.  (*Id.* at 156.)  When Dr. Lobel "did not receive a response back [from Dr. Vibert] by the due date requested," he "was instructed to proceed with the case."  (*Id.*)

records, Defendant stated:

> . . . We acknowledge the presence of Ms. Mellian's medical conditions and reported symptoms that may require ongoing treatment. However, the presence of a medical condition, reported symptom or treatment for such does not determine an ongoing Disability. At the conclusion of the appeal process, we find that the weight of the evidence does not substantiate that Ms. Mellian was Disabled and prevented from performing one or more of the Essential Duties of her occupation after 02/28/13; as is required by the Atkore International, Inc. policy for LTD benefits to continue beyond that date.
>
> Although Ms. Mellian states she is not able to return to work due to the combination of back and foot symptoms, our position remains that the medical findings do not substantiate this level of impairment. Providers Dr. Grant and Mr. Nysowy opine that your client is not restricted from sedentary level work due to her foot condition. Two Independent Medical Consultants opine that Ms. Mellian's medical conditions would not preclude sedentary level work activities.
>
> Teri Mellian had back surgery in 2010 and was capable of resuming work activities. Dr. Vibert and Dr. Grant are now supporting Ms. Mellian's claim of total disability based on her back condition. However, Dr. Vi[]bert's 04/09/13 office visit note documents that your client's back condition does not require additional surgery and that she is neurologically intact. Ms. Mellian was not referred to a pain management specialist for severe or uncontrolled pain. Notably, the medication listing at this appointment also does not include prescription medications for pain. While we are not disputing Ms. Mellian's complaints of pain, we find that the evidence presented does not support the presence of disabling levels of pain or an inability to perform work activities due to her back condition, foot condition or a combination thereof.

(*Id.* at 95-96.) Through the present suit, Plaintiff seeks to overturn this decision

denying her application for long term disability benefits.

16

## III.  <u>CONCLUSIONS OF LAW</u>

**A.     The Standards Governing the Parties' Cross-Motions**

A participant in or beneficiary of a plan governed by ERISA may bring suit in federal district court to recover benefits due under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B).  Courts review *de novo* a denial of benefits challenged under this provision, unless the benefit plan confers upon the administrator the discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case a more deferential "arbitrary and capricious" standard applies.  *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996).

In this case, Defendant argues that two separate provisions of the Policy trigger the more deferential "arbitrary and capricious" standard of review.  First, the Policy includes language that expressly confers upon Defendant the "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of this Policy."  (Admin. Record at 29; *see also id.* at 31.)  Next, the Policy elsewhere states that the proof of loss submitted in support of a claim for benefits "must be satisfactory" to Defendant.  (*Id.* at 16.)  As Defendant observes, the Sixth Circuit has recognized that plan language of this sort

17

confers sufficient discretionary authority to warrant judicial review under the "arbitrary and capricious" standard. *See Frazier v. Life Insurance Co. of North America,* 725 F.3d 560, 567 (6th Cir. 2013) ("This Court has found 'satisfactory proof,' and similar phrases, sufficiently clear to grant discretion to administrators and fiduciaries."); *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 292 (6th Cir. 2005) (holding that plan language granting the plan administrator the "sole discretion" to "construe the terms of" a long term disability policy and "to determine eligibility" under the policy triggered arbitrary and capricious review).

In response, Plaintiff does not dispute that this Policy language, standing alone, would support arbitrary and capricious review of Defendant's decision to deny her claim for long term disability benefits. (*See* Plaintiff's Motion, Br. in Support at 13.) Nonetheless, she points out that the inquiry is complicated by Michigan's adoption in 2007 of an insurance regulation stating that "a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect." Mich. Admin. Code R. 500.2202(c). The Sixth Circuit has held that ERISA does not preempt this state insurance rule, *see American Council of Life Insurers v. Ross,* 558 F.3d 600, 608-09 (6th Cir. 2009), and courts in this District have found that this Michigan regulation, where it applies, operates to override a

clause in an insurance policy that otherwise would confer discretionary authority

on an ERISA plan administrator and thereby trigger arbitrary and capricious

review, *see, e.g., Gray v. Mutual of Omaha Life Insurance Co.,* No. 11-15016,

2012 WL 2995469, at \*3-\*4 (E.D. Mich. July 23, 2012).

The Court agrees with Defendant, however, that this state insurance rule is

not applicable here.  By its terms, Rule 500.2202(c) applies only to a "policy,

contract, rider, indorsement, certificate, or similar [insurance] contract document"

that is ***"issued or delivered to"*** a person in Michigan.  Mich. Admin. Code R.

500.2202(c) (emphasis added).  The Policy in this case expressly states that it was

issued by Defendant to Plaintiff's employer, Atkore International, and that a copy

of the Policy is available for review in Atkore's office located in Harvey, Illinois.

(*See* Admin. Record at 5, 29; *see also id.* at 36 (identifying the Policy's place of

delivery as Illinois).)  Under this record, it cannot be said that the Policy was

issued in Michigan, nor is there any evidence that it was delivered to any

individual in Michigan.  It seemingly follows, then, that the Michigan insurance

rule cited by Plaintiff does not override the Policy's express grant of discretionary

authority to Defendant.  *See, e.g., Tikkanen v. Liberty Life Assurance Co.,* 31 F.

Supp.3d 913, 920-22 (E.D. Mich. 2014) (finding no basis to apply Rule

500.2202(c) to void a discretionary clause in a long term disability insurance

policy, where the policy was issued in Georgia and there was no evidence that any relevant insurance document was delivered to anyone in Michigan); *Rice v. Sun Life & Health Insurance Co.,* No. 1:12-cv-1362, 2014 WL 24046, at *5 (W.D. Mich. Jan. 2, 2014) (likewise declining to apply the state insurance rule because the long term disability policy in that case "state[d] that it was issued in Rhode Island and [wa]s governed by the laws of that state").

Plaintiff's efforts to avoid this conclusion are not persuasive. First, she observes that the Policy in this case lacks a choice of law provision, and thus does not expressly disclaim the application of Michigan's laws and insurance regulations in favor of the laws of another state. As Plaintiff points out, the courts in at least some cases have cited a policy's affirmative choice of another state's law as a basis for concluding that Rule 500.2202(c) did not operate to void a discretionary clause in the policy. *See Rice,* 2014 WL 24046, at *5 (pointing to language in the policy providing that it was governed by the laws of Rhode Island); *Foorman v. Liberty Life Assurance Co.,* No. 1:12-cv-927, 2013 WL 1874738, at *1, *3 (W.D. Mich. May 3, 2013) (citing a provision stating that the policy was subject to the laws of Pennsylvania). Yet, the lack of a choice of law provision in the Policy is unhelpful to Plaintiff here, because the Court would be quite prepared to consider the application of Michigan's Rule 500.2202(c) in this case, but for the

20

absence of evidence that would satisfy the Rule's own requirement of an insurance contract document that was "issued or delivered to" a person in Michigan.  The inapplicability of Rule 500.2202(c) to the Policy is not due to language in the Policy steering the Court toward another state's law, nor does it reflect the Court's generalized reluctance to apply the laws and insurance regulations of Michigan versus some other state.  Rather, Rule 500.2202(c) is inapplicable because the conditions set forth in the Rule itself have not been satisfied.

Plaintiff next points to language in the Policy itself that appears to contemplate the issuance or delivery of a certificate of insurance to her and other individual Atkore employees covered by the Policy.  Specifically, Plaintiff cites the Policy's definition of "You or Your" as "the person to whom this certificate is issued," (Admin. Record at 22), and she surmises that since she resided in Michigan when the Policy was issued in 2011, a certificate of insurance must have been delivered or issued to her in Michigan at that time.

Judge Lawson addressed (and rejected) precisely this argument in *Tikkanen,* 31 F. Supp.3d at 921-22.  The insurance policy at issue in *Tikkanen* called for the defendant insurer to "provide a certificate to" the plan sponsor "for delivery to Covered Persons."  31 F. Supp.3d at 921.  Despite this language contemplating delivery of an insurance certificate to employees covered by the policy, the court

21

observed that the plaintiff had "offered no proof that any certificate or other policy document actually was delivered to him or any other 'person' in Michigan." 31 F. Supp.3d at 921. In the absence of such evidence, the court concluded that the plaintiff had failed to establish that an insurance document with a discretionary clause had been delivered to an individual in Michigan, such that Rule 500.2202(c) would operate to void this clause. 31 F. Supp.3d at 922. This Court finds the reasoning of *Tikkanen* persuasive, and likewise concludes that Plaintiff here cannot invoke Rule 500.2202(c) to void any discretionary clause in the Policy, absent evidence that an insurance certificate or some other policy document was actually issued or delivered to her or some other individual in Michigan.

Finally, and most promisingly, Plaintiff points to an amendatory rider to the Policy that is deemed to be "attached to all certificates given in connection with [t]he Policy," and which states in pertinent part that "[f]or Michigan residents, the Policy Interpretation provision [of the Policy] is deleted in its entirety." (Admin. Record at 23-24.) While this rider does not specify what is meant by the "Policy Interpretation provision" of the Policy, and the Court's inspection of the Policy fails to disclose any provision bearing that exact label, Plaintiff evidently views the rider as implicitly adopting Rule 500.2202(c) by deleting the language in the Policy that grants Defendant the "full discretion and authority . . . to construe and

22

interpret all terms and provisions of this Policy." (*Id.* at 29.) Regardless, then, of whether Rule 500.2202(c) expressly applies under the circumstances presented here, Plaintiff argues that Defendant voluntarily agreed to abide by this Rule when it amended the Policy to remove the discretionary interpretation clause that is prohibited under the Rule.

This argument, even if accepted, does not get Plaintiff all the way to the desired *de novo* review of Defendant's denial of her claim for benefits. The Policy amendment cited by Plaintiff, if construed in the manner she suggests, would effectively remove the clause in the Policy that confers upon Defendant the "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (*Id.*) Nonetheless, a separate Policy provision dictates that the proof of loss submitted in support of a claim for benefits "must be satisfactory" to Defendant. (*Id.* at 16.) As explained earlier, this language alone suffices to trigger judicial review under the more deferential "arbitrary and capricious" standard, *see Frazier,* 725 F.3d at 567, even without the additional Policy provision granting Defendant the discretion to interpret the terms of the Policy.[6]

---

[6]It also is worth noting that Plaintiff's challenge to the Defendant insurer's decision in this case does not turn upon any particular construction of the language of the Policy, but instead rests upon Defendant's determination that the medical evidence

Accordingly, the Court will apply the "arbitrary and capricious" standard in reviewing Defendant's denial of Plaintiff's claim for long term disability benefits. This is the "least demanding form of judicial review," under which the Court must uphold a denial of benefits if it is "rational in light of the plan's provisions." *Monks v. Keystone Powdered Metal Co.,* 78 F. Supp.2d 647, 657 (E.D. Mich. 2000) (internal quotation marks and citations omitted), *aff'd,* 2001 WL 493367 (6th Cir. May 3, 2001). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citations omitted). Thus, "[b]efore concluding that a decision was arbitrary and capricious, a court must be confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." *Marchetti v. Sun Life Assurance Co.,* 30 F. Supp.2d 1001, 1008 (M.D. Tenn. 1998). Even where "the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then

─────────────────────────

produced by Plaintiff was insufficient to establish that she was unable to perform one or more of the essential duties of her own occupation. This question whether Plaintiff has produced satisfactory evidence of a disability is expressly committed to Defendant's discretion under the Policy, through a provision wholly separate from the discretionary interpretation clause that was deleted from the Policy as it applies to Michigan residents.

the decision is neither arbitrary nor capricious." *Schwalm v. Guardian Life Insurance Co.,* 626 F.3d 299, 308 (6th Cir. 2010).

In reviewing Defendant's decision to deny benefits, the Court is "confined to the record that was before the Plan Administrator," and "may not admit or consider any evidence not presented to the administrator." *Wilkins,* 150 F.3d at 615, 619. The pertinent record, however, encompasses all materials considered during any phase of the administrative review process, whether in connection with Defendant's initial decision or its determination to affirm this decision on administrative appeal. *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir. 1991). Finally, Plaintiff correctly points to the "inherent conflict of interest" in Defendant's consideration of her request for disability benefits, in light of Defendant's dual role as "the payor of any long-term disability benefits and the administrator vested with discretion to determine [Plaintiff's] eligibility for those benefits." *Schwalm,* 626 F.3d at 311. While this conflict of interest does not dictate the outright displacement of the arbitrary and capricious standard of review, it is a factor that the Court must consider, among others, in determining whether Defendant's decision to deny benefits should be reversed or affirmed. *See Schwalm,* 626 F.3d at 311-12.

**B.   Defendant's Denial of Plaintiff's Claim for Long Term Disability Benefits Was Not Arbitrary or Capricious, But Instead Was Supported**

25

**by Substantial Evidence.**

With these standards in mind, the Court turns to a review of Defendant's decision that Plaintiff was not eligible for continued long term disability benefits after February 28, 2013.  In seeking the reversal of this decision, Plaintiff argues that it suffers from two fundamental defects:  (i) a failure to give sufficient weight to the opinions of Plaintiff's treating physicians, and (ii) the failure of the two independent medical consultants retained by Defendant to thoroughly consider the entirety of the medical record in reaching their conclusions that Plaintiff remained capable of performing primarily sedentary work.  The Court addresses each of these two challenges in turn.

In Plaintiff's view, the opinions and findings of her two treating physicians, Drs. Grant and Vibert, establish that she was unable to perform at least one of the essential duties of her job as an accounting specialist — namely, sitting.  (*See* Plaintiff's Motion, Br. in Support at 19.)  The physical demands analysis for this position, as conducted by Plaintiff's employer, stated that this job entailed sitting for up to half an hour at a time for a total of six hours per day, standing for no more than half an hour per day, no walking, and alternating between sitting and standing

as needed.  (*See* Admin. Record at 262.)[7]  In response to an inquiry made by

Defendant as it processed Plaintiff's claim for benefits, Dr. Grant indicated on

February 25, 2013 that Plaintiff was capable of performing "[f]ull-time, primarily

sedentary activities" so long as she was "given the opportunity to alternate"

between sitting and standing and to "walk as needed for comfort."  (*Id.* at 223-24.)

In addition, a December 12, 2012 work note issued by Dr. Grant's office stated that

Plaintiff would be able to return to work on January 14, 2013, provided that she

was allowed to sit or stand "[a]s [t]olerated."  (*Id.* at 282.)  Dr. Vibert, in turn,

stated in an December 12, 2012 office note that Plaintiff was limited to "sitting or

standing for [no] more than 30 minutes at a time," (*id.* at 232), and he reiterated

these same restrictions at a subsequent January 17, 2013 office visit, (*see id.* at

229).

Thus, as Defendant explained in its initial March 12, 2013 decision finding

that Plaintiff was eligible for long term disability benefits only through February

28, 2013, the limitations and restrictions imposed by Plaintiff's two treating

physicians were fully consistent with the essential duties of her job as an

---

[7]Defendant likewise conducted its own occupational analysis of Plaintiff's job
based on her employer's description of the essential duties of this position, and it
concluded that this job was properly characterized as "[s]edentary" with the need to sit for
half an hour at a time and for a total of six hours per day.  (*Id.* at 70.)

accounting specialist.  Under this record, the Court fails to see how Defendant

could be faulted for giving insufficient weight to the opinions and findings of

Plaintiff's physicians, much less how Defendant's treatment of these opinions and

findings could be deemed arbitrary and capricious.  To the contrary, Defendant's

initial decision, at least, fully incorporated and appropriately relied upon the

medical records and findings of Plaintiff's treating physicians, and Plaintiff has

failed to suggest otherwise.  Instead, she points to portions of the medical record

disclosing such serious medical conditions as neuropathy, permanent nerve injury,

and complications following bunion surgery.  The bare existence of such

conditions, however, does not equate to disability within the meaning of the Policy,

and Plaintiff has not pointed to any findings or opinions of her physicians prior to

Defendant's initial decision that were unaccounted for in, or inconsistent with,

Defendant's determination that Plaintiff did not meet this standard of disability.

To be sure, Plaintiff obtained additional records and opinions from her

treating physicians in support of her appeal of Defendant's initial decision, and

these later materials were indicative of greater limitations in Plaintiff's ability to

engage in work activities.  In particular, Dr. Vibert concluded following an April 9,

2013 office visit that in addition to the restrictions he had previously imposed,

including no sitting or standing for more than 30 minutes at a time, Plaintiff

28

"required frequent periods of lying down for back, buttock, [and] leg pain flareup."

(Admin. Record at 213.)  In light of these restrictions "combined with [Plaintiff's]

bilateral foot issues," Dr. Vibert opined that Plaintiff "should be permanently

disabled from her job."  (*Id.*)  Likewise, Dr. Grant stated in a March 27, 2013 letter

that Plaintiff "apparently is unable to sit for more than 30 minutes at a time" due to

back problems, and that a "combination of back and foot problems" left her unable

to "stand for much more than 30 minutes at time."  (*Id.* at 212.)  Dr. Grant added

that "[a]lternating sitting and standing is not an option for [Plaintiff] as both of

these cause her similar discomfort," and he concluded that she was "unable to

perform duties of her job because of the inability to stand or sit for more than a

very short period of time."  (*Id.*)

Although these more recent opinions offered by Drs. Vibert and Grant

certainly would support a finding of disability, it is well established that an insurer

such as Defendant need not give special deference or weight to the opinions of a

claimant's treating physicians when evaluating a claim for disability benefits.  *See*

*Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 123 S. Ct. 1965, 1972

(2003); *Balmert v. Reliance Standard Life Insurance Co.,* 601 F.3d 497, 504 (6th

Cir. 2010).  In declining to accept the opinions of Plaintiff's treating physicians

that Plaintiff could not perform the duties of her job and thus was disabled,

29

Defendant pointed to (i) the lack of medical findings that would "substantiate this level of impairment," and (ii) the opinions of two consulting physicians, Drs. Rubinfeld and Lobel, that Plaintiff remained capable of performing primarily sedentary work activities.  (*See* Admin. Record at 95-96.)

Both of these grounds for discounting the opinions of Plaintiff's treating physicians are recognized in the case law as sufficient to pass muster under "arbitrary and capricious" review.  First, the courts have confirmed that a plan administrator does not act arbitrarily or capriciously by declining to credit the opinion of a physician, treating or otherwise, that lacks support in the medical record.  *See Boone v. Liberty Life Assurance Co.,* No. 05-1090, 161 F. App'x 469, 473 (6th Cir. Dec. 20, 2005); *White v. Standard Insurance Co.,* 895 F. Supp.2d 817, 848 (E.D. Mich. 2012).  In this case, the physician treating Plaintiff for her foot condition, Dr. Grant, opined in both December of 2012 and February of 2013 that Plaintiff was capable of performing the duties of a primarily sedentary occupation so long as she was permitted to alternate between sitting and standing as needed for comfort.  (*See* Admin. Record at 223-24, 282.)  Though Dr. Grant revised this opinion in a March 27, 2013 letter, stating his view that Plaintiff was "unable to perform [the] duties of her job because of the inability to stand or sit for more than a very short period of time," (*id.* at 212), the record discloses only one

office visit in March of 2013 that could supply medical findings in support of this

changed opinion. Yet, Dr. Grant's examination during this March 2013 office visit

revealed that Plaintiff's right foot was "in relatively good condition" following her

bunion surgery in June of 2012, and x-rays showed that this foot had "healed"

since this surgery. (*Id.* at 164.) In addition, Plaintiff reported to Dr. Grant that her

right foot was "doing well," and that she was not experiencing any "specific pain"

over the bunion that remained in her left foot. (*Id.*)

Notably, when Dr. Grant opined in the wake of this March 2013 office visit

that Plaintiff was "medically disabled from her type of employment," he cited her

"back problems" as the basis for his conclusion that she "apparently [wa]s unable

to sit for more than 30 minutes at a time." (*Id.* at 212; *see also id.* at 164 (noting at

Plaintiff's March 27, 2013 office visit that Plaintiff reported difficulty in "sit[ting]

for any period of time" because of "her back issue," and concluding that it was

"very difficult for [Plaintiff] either to stand or sit for any period of time" due to a

"combination of back and foot pathology").) Similarly, when one of the physician

consultants retained by Defendant, Dr. Rubinfeld, contacted Dr. Grant to discuss

Plaintiff's condition, Dr. Grant reportedly "agreed that the feet are not the cause

of" Plaintiff's disability. (*Id.* at 144.) In light of this record, which discloses no

evidence of further worsening in Plaintiff's foot condition that could account for

the change in Dr. Grant's opinion, and which indicates that the additional

restrictions imposed in Dr. Grant's later opinion were attributable in significant

part to a back condition that he was not treating, the Court cannot say that

Defendant acted arbitrarily or capriciously in declining to adopt Dr. Grant's

opinion that Plaintiff was unable to perform the duties of her job.[8]

Likewise, it was appropriate for Defendant to discount the changed opinion

of Plaintiff's other treating physician, Dr. Vibert, as lacking a basis in the medical

record.  Again, while Dr. Vibert stated in December 20, 2012 and January 17, 2013

office notes that Plaintiff's condition could be accommodated through a restriction

to sitting or standing for no more than 30 minutes at a time, (*see id.* at 229, 232), he

then concluded following an April 9, 2013 office visit that Plaintiff "required

frequent periods of lying down for back, buttock, [and] leg pain flareup," and that

she therefore was "permanently disabled from her job," (*id.* at 213).  Yet, Dr.

Vibert's examination of Plaintiff at this office visit revealed that she was physically

"[s]table" and "neurologically intact," and that she had "no more compressive

---

[8]As Defendant points out, when a plan administrator is weighing the opinion of a treating physician, it is appropriate to consider the possibility that the physician might be acting more as his patient's "disability advocate" than as "a physician rendering objective opinions."  *White,* 895 F. Supp.2d at 848; *see also Nord,* 538 U.S. at 832, 123 S. Ct. at 1971.  Such caution appears particularly appropriate where, as here, a treating physician offers a revised opinion imposing greater restrictions on the heels of an initial decision explaining that the physician's opinions and findings to that point did not support an award of disability benefits.

lesions in her back that would necessitate surgery or suggest that surgery would help her." (*Id.*)  In addition, Dr. Vibert cited Plaintiff's "bilateral foot issues" as contributing to his conclusion that Plaintiff was "permanently disabled from her job." (*Id.*)  Against this backdrop, it was not arbitrary or capricious for Defendant to discount Dr. Vibert's more recent opinion as lacking the support of objective medical findings, and as relying in part on a foot condition that Dr. Vibert neither examined nor treated and that did not lie within his area of expertise.

Next, the case law recognizes that it is not necessarily arbitrary or capricious for a plan administrator to prefer the opinion of a non-treating medical professional over that of a claimant's treating physician, even where the former rests upon a review of the medical record rather than direct examination of the claimant. *See Balmert,* 601 F.3d at 504; *White,* 895 F. Supp.2d at 848; *Harris v. Kemper Insurance Cos.,* 360 F. Supp.2d 844, 849 (E.D. Mich. 2005).  Indeed, as a general rule, "when a plan administrator chooses to rely upon the medical opinions of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *McDonald v. Western-Southern Life Insurance Co.,* 347 F.3d 161, 169 (6th Cir. 2003).  In this case, then,

33

so long as the opinions of the consulting physicians retained by Defendant, Drs. Rubinfeld and Lobel, are "reasonable and based on the evidence," *Harris,* 360 F. Supp.2d at 849 — a point contested by Plaintiff, as discussed immediately below — Defendant cannot be said to have acted arbitrarily and capriciously by electing to give greater weight to the opinions of these two consulting physicians than to the opinions of Plaintiff's treating physicians.

Accordingly, the Court turns to Plaintiff's contention that the opinions of the consulting physicians retained by Defendant, Drs. Rubinfeld and Lobel, suffer from various defects that preclude Defendant's reliance on them as a proper basis for denying Plaintiff's claim for disability benefits.  First, Plaintiff faults these consulting physicians for purportedly ignoring the pertinent medical findings of her treating physicians.  She takes issue, for example, with a statement in Dr. Lobel's report that the "examinations by [Plaintiff's] providers [we]re normal," (Admin. Record at 156), contending that this assertion is contradicted by (i) statements in the office notes of Plaintiff's treating physicians recounting her reports of foot and back pain, (*see, e.g., id.* at 164, 229), (ii) the record of a December 2012 "[a]bnormal" bone scan that reported "increased tracer activity" in Plaintiff's lower back and "focal intense tracer activity in [her] right midfoot" following her foot surgery, (*id.* at 236), and (iii) a January 7, 2013 MRI that

34

revealed a "[m]ild posterior disc bulge at L3-4 result[ing] in mild central canal stenosis," (*id.* at 238). Yet, it is clear that Dr. Lobel's report of "normal" examinations was meant to refer only to the portions of Dr. Vibert's and Dr. Grant's office notes in which they recounted their findings upon physically examining Plaintiff during her office visits, and these findings are accurately characterized as largely "normal" in nature. (*See, e.g., id.* at 165 (Dr. Grant 12/12/2012 office note reporting that following the removal of the hardware from Plaintiff's right foot, the "incision is clean and dry without erythema or drainage," "sensation is normal," and Plaintiff was experiencing only "minimal swelling"); *id.* at 229 (Dr. Vibert 1/17/2013 office note reporting that "[o]n examination, sensation and motor function are intact"); *id.* at 232 (Dr. Vibert 12/20/2012 office note reporting that "[o]n examination, there is pain with range of motion of the lumbar spine," but that "[s]ensation and motor function are intact throughout the bilateral lower extremities").)[9] Plaintiff also complains that Dr. Rubinfeld "ignored" the record of Plaintiff's most recent office visit to Dr. Grant on March

_____

[9]Along the same lines, Plaintiff chides Dr. Lobel for "fail[ing] to read the [record] carefully," (Plaintiff's Motion, Br. in Support at 23), in light of his reference to a "CT scan" that "fail[ed] to show complication from surgery," (Admin. Record at 155), when in fact Plaintiff underwent a bone scan rather than a CT scan. As Plaintiff herself recognizes, however, the bone scan in question entailed "low dose CT imaging," (Plaintiff's Motion, Br. in Support at 23 (quoting Admin. Record at 236)), so it can hardly be said that Dr. Lobel's reference to a "CT scan" evidences an incomplete or careless review of the record.

27, 2013, (Plaintiff's Motion, Br. in Support at 24), but Dr. Rubinfeld expressly addressed this office visit in an August 22, 2013 addendum to his initial report, explaining that the record of this additional visit did not "change [his] prior opinion" because "there is nothing about [Dr. Grant's] foot exam that reflects a problem with sitting," (Admin. Record at 147).

Plaintiff next faults Dr. Lobel for an overly dismissive view of her reports of pain to her treating physicians, and for concluding that these reports of pain did not warrant additional restrictions or limitations on Plaintiff's ability to perform sedentary work activities. Dr. Lobel explained, however, that he reviewed the record as disclosing only "uncomplicated spine and foot surgery," as well as "normal" examinations by Plaintiff's treating physicians, "no care . . . other than follow-up visits," and "no therapy, medications, or referrals." (*Id.* at 156.) Against this backdrop, Dr. Lobel opined that "[t]here may be a greater affective than nociceptive component of [Plaintiff's] pain[,] making the pain appear more severe than the imaging or examinations would typically account for," and he concluded that Plaintiff's "pain does not add to impairment based on diagnosis or severity." (*Id.* at 157.) While Plaintiff might prefer a different reading of this record, and while she points to evidence that supports this alternative reading — *e.g.,* Dr. Vibert's suggestion at a January 17, 2013 office visit that she consider taking

36

Lyrica and Neurontin, and her response that she was reluctant to use these medications due to their side effects, (*see id.* at 229) — it cannot be said that Dr. Lobel's assessment of Plaintiff's subjective complaints of pain is unreasonable or devoid of evidentiary support, such that it would be arbitrary or capricious for Defendant to rely on Dr. Lobel's opinion on this matter.

Next, Plaintiff points to the billing records of Drs. Rubinfeld and Lobel — reflecting that each of these physicians spent only 1.5 hours reviewing Plaintiff's file and preparing his initial report — as suggestive of a cursory and superficial review and analysis of Plaintiff's medical records and conditions. Plaintiff fails to explain, however, precisely how much additional time these physicians should have devoted to their review in order to ensure that it was sufficiently thorough and complete.[10] Nor, more importantly, does Plaintiff identify any specific information that these physicians overlooked in their purported haste to conclude their

---

[10]Along the same lines, Plaintiff seems to suggest that Dr. Lobel made insufficient efforts to contact Dr. Vibert during his review of Plaintiff's medical records. In his report, however, Dr. Lobel states that he called Dr. Vibert's office on three separate occasions, and that he then faxed a set of questions to Dr. Vibert as instructed by someone in his office. (*See id.* at 156.) While Plaintiff protests that there is no evidence in the record to confirm this fax transmission, she fails to suggest any reason to doubt Dr. Lobel's representation that his questions were "successfully faxed" to Dr. Vibert's office on August 13, 2013, but that no responses were received by the requested due date. (*Id.*) More generally, Plaintiff fails to suggest how many more efforts Dr. Lobel should have made to contact Dr. Vibert.

reviews.[11]  Accordingly, the Court cannot say that the length of time spent by Drs. Rubinfeld and Lobel in conducting their reviews renders Defendant's reliance on their resulting reports arbitrary or capricious.

Finally, and more generally, Plaintiff faults both Dr. Lobel and Dr. Rubinfeld for their "utter failure . . . to explain why the opinions and findings of Drs. Vibert and Grant should be rejected."  (Plaintiff's Motion, Br. in Support at 22-23.)  Even a cursory reading of the reports of Drs. Lobel and Rubinfeld belies this criticism.  First and foremost, these consulting physicians cannot fairly be said to have "rejected" the finding of Drs. Vibert and Grant, where their reports — and especially the report of Dr. Lobel, (*see* Admin. Record at 155-56) — thoroughly recount these findings.  Instead, Drs. Rubinfeld and Lobel disagreed with the ***conclusions*** of Drs. Vibert and Grant, at least to the extent that these treating physicians opined that Plaintiff was incapable of performing the duties of her primarily sedentary occupation.

More importantly, it is simply inaccurate to say that these consulting physicians failed to explain the grounds for their disagreements with Drs. Vibert

---

[11]Indeed, both Dr. Rubinfeld and Dr. Lobel observed that the medical records produced by Plaintiff were fairly limited.  (*See id.* at 144 (Dr. Rubinfeld states that "[t]he medical documentation related specifically to the right foot is quite limited"); *id.* at 156 (Dr. Lobel notes the absence of any "care provided other than follow-up visits," and observes that there is no record of "therapy, medications, or referrals").)

and Grant as to Plaintiff's ability to perform sedentary work activities. Dr.
Rubinfeld stated that the normal period of recovery following bunion surgery is 42
days, and that the "quite limited" medical record pertaining to Plaintiff's foot
condition did not support continued restrictions or limitations following Plaintiff's
recovery from foot surgery, particularly in the absence of any documented pre- or
post-operative physical examination of Plaintiff's foot that might have disclosed
the need for such continued restrictions. (*See id.* at 144-45.)[12] Dr. Lobel, in turn,
stated that the medical record revealed "normal imaging of the spine" and
"normal" examinations by Plaintiff's treating physicians," and he further noted the
absence of "care provided other than follow-up visits," such as "therapy,
medications, or referrals." (*Id.* at 156-57.)

More generally, it bears emphasis that the reports of Drs. Rubinfeld and
Lobel are wholly consistent with the findings of Plaintiff's treating physicians prior
to Defendant's initial decision to deny Plaintiff's claim for disability benefits. It
was only ***after*** this decision that Drs. Vibert and Grant issued revised opinions with
restrictions — such as a need for "frequent periods of lying down," (*id.* at 213),
and the "inability to stand or sit for m ore than a very short period of time," (*id.* at

---

[12]Dr. Rubinfeld further stated that upon discussing Plaintiff's condition with Dr.
Grant, "[i]t was agreed that the feet are not the cause of this claimant's 'disability.'" (*Id.*
at 144.)

212) — that would preclude Plaintiff from carrying out the essential duties of her job.  To the extent that Drs. Rubinfeld and Lobel can be said to have "rejected" the findings of Plaintiff's treating physicians, it was only these latter findings that they declined to adopt, and the Court has already explained that Defendant was entitled to disregard these opinions as lacking support in the medical record.  Consequently, the Court finds no basis under the applicable (and deferential) "arbitrary and capricious" standard of review to overturn Defendant's denial-of-benefits decision for undue or improper reliance on the opinions of the consulting physicians retained to review Plaintiff's file.

Having resolved Plaintiff's principal challenges to Defendant's decision that Plaintiff was ineligible for long term disability benefits after February 28, 2013, the Court need only briefly address two additional points raised by Plaintiff in passing in her motion seeking the reversal of Defendant's decision.  First, Plaintiff notes that Defendant was authorized under the Policy to arrange for a physical examination of Plaintiff, but instead opted for a file review by Drs. Rubinfeld and Lobel.  The Sixth Circuit has explained, however, that there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."  *Calvert,* 409 F.3d at 296.  Rather, the court instead observed that a plan administrator's "failure to conduct a physical examination —

40

especially where the right to do so is specifically reserved in the plan — may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." 409 F.3d at 295. As discussed, Plaintiff has not identified any such deficiencies in the thoroughness or accuracy of Defendant's benefits determination in this case. Neither has she suggested how a physical examination might have overcome any such shortfall in Defendant's decisionmaking process. To the contrary, Plaintiff produced the records of her treating physicians for both of the conditions that contributed to her claimed disability, and the Court has already explained that the consulting physicians retained by Defendant adequately reviewed and accounted for the medical findings in these records in preparing their reports and opining that Plaintiff remained capable of primarily sedentary work activities. Thus, Defendant's failure to pursue a physical examination of Plaintiff did not render its benefits decision arbitrary or capricious.

Finally, Plaintiff notes that Defendant operated under a conflict of interest as both the entity with the authority to decide her claim for disability benefits and the payor of any benefits awarded to her under the Policy, and she points out that this conflict must be considered as a factor in the Court's review of Defendant's benefits determination. *See Schwalm,* 626 F.3d at 311. Upon reviewing the record, however, the Court sees no evidence that Defendant's conflict of interest

41

improperly factored into its decision that Plaintiff was no longer eligible for long

term disability benefits after February 28, 2013.  Rather, the record shows that

Defendant and its consulting physicians sufficiently reviewed and considered all of

the medical evidence in determining that Plaintiff was capable of performing the

essential duties of her occupation, and that Defendant provided a reasoned

explanation of its decision, both initially and on administrative appeal.[13]

Accordingly, the existence of a conflict of interest does not alter the Court's

conclusion that Defendant's denial-of-benefits decision survives scrutiny under the

deferential "arbitrary and capricious" standard of review.[14]

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's February

---

[13]In her present motion, Plaintiff reiterates her argument from an earlier motion that she should have been given the opportunity to conduct discovery in order to further explore the extent to which Defendant's conflict of interest might have affected its decision to deny her claim for benefits.  The Court thoroughly addressed this issue in a prior December 24, 2014 opinion and order, and sees no need to revisit the matter here.

[14]While Defendant's decision has been reviewed under the "arbitrary and capricious" standard, the Court observes in closing that the result here would be no different if Defendant's decision were reviewed *de novo.*  Most notably, the medical findings of Plaintiff's own treating physicians are wholly consistent with the conclusion that she was capable by late February of 2013 of performing the essential duties of her sedentary accounting specialist position, and the revised opinions of these physicians that Plaintiff was disabled were not supported by new medical findings that would account for the additional restrictions imposed by these physicians.

20, 2015 motion to reverse the decision of the plan administrator (docket # 19) is

DENIED, and that Defendant's February 20, 2015 motion for entry of judgment

(docket #18) is GRANTED.

s/Gerald E. Rosen
United States District Judge

Dated:  February 12, 2016

I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on February 12, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135

43